## PEOPLE v. BURT.

(Supreme Court, Appellate Division, Third Department. May 2, 1900.)

1. CRIMINAL LAW—INSTRUCTION—MURDER IN SECOND DEGREE.

A masked man entered defendant's house and endeavored to shoot defendant's wife; and the wife's father interfered to protect his daughter, and was shot and killed by the intruder. On trial of defendant for the crime, it was the theory of the prosecution that defendant wished the wife out of the way, that he might marry a certain girl; and the court charged that if defendant intended to kill the wife and flee, and did not have it in his heart to kill the father, or, after the assault on her, found it essential to get rid of the father, without having had any deliberated design so to do, it might be murder in the second degree. *Held*, the charge was not erroneous, since the court could not have charged that there was premeditation and deliberation, as matter of law.

2. SAME—ERROR—FAILURE TO TAKE EXCEPTIONS.

Where, on prosecution for murder, no exception was taken to a charge as given, and no instruction requested different from the charge, defendant could not specify error as to the charge.

3. SAME—EVIDENCE—SUFFICIENCY.

Defendant had been away from home two days, when, about 7 in the evening, a masked man rushed into the sitting room of his house and shot twice at defendant's wife, and then, being seized by the wife's father, shot him and fled; the assailant not speaking all the while. Neither the wife nor father had enemies, but it was shown by the testimony of D., a young woman, and that of her father, that defendant was in love with D.; that he had proposed to go West and get a divorce, and had written in her album a sentiment expressing a hope that he might some day be hers. Previous to the crime, defendant had purchased a revolver, kept concealed by him until long after the crime, and the cartridges used by the criminal were traced to the store where defendant had purchased cartridges. Defendant had purchased at Potsdam, the afternoon of the shooting, a hat similar to that worn by the criminal; and the handkerchief used as a mask had been secured at a store in which defendant had been the afternoon of the shooting, and from which he could have taken it. At 5:30 in the afternoon, defendant was seen in Potsdam, walking in a homeward direction, carrying a bundle; and two men acquainted with defendant saw him, an hour and a half after the shooting, going from the direction of his home into Potsdam. Defendant had endeavored to procure the silence of the seller of the revolver, and to procure evidence to prove an alibi, and had cautioned the father of D. that he might testify that defendant visited his house on business. *Held* sufficient to sustain a conviction of murder in the second degree.

4. SAME—TESTIMONY ON EXAMINATION.

After the commission of a murder, one S. was arrested and charged therewith; and, on his examination, defendant, who was not suspected of the offense, was a witness for the people, and gave considerable evidence as to his whereabouts at the time the murder was committed. *Held*, that the introduction of such testimony in evidence on a subsequent trial of defendant for the offense did not vitiate a judgment against defendant.

5. SAME—EVIDENCE.

Where, on a trial for murder, it was the theory of the prosecution that defendant had passed along a certain road between certain hours to reach the scene of the crime, and had, after its commission, returned along the road, it was proper to admit in evidence testimony of witnesses that they saw a man going in the direction claimed to have been taken by defendant during certain hours, and describing certain characteristics of the man seen, though witnesses could not identify him as defendant.

6. SAME—EVIDENCE—ANTE MORTEM STATEMENT.

Where one lived 12 days after being shot, and, being told that he must die, said that he knew he must, and thereupon made an ante mortem

64 N.Y.S.—27

statement, such statement was admissible in evidence on a trial for the murder.

Appeal from trial term, St. Lawrence county.

Howard A. Burt was convicted of murder in the second degree, and he appeals. Affirmed.

Upon November 10, 1897, at about 7 o'clock in the evening, Asa W. Briggs was shot, and about 12 days thereafter died. Upon that evening he, with his daughter, the defendant's wife, his grandson, and a servant girl, were in the sitting room of his and defendant's house, in the town of Pierrepont, St. Lawrence county. The defendant had been away for about two days. At 7 o'clock upon the night of the 10th, a knock was heard at the front door. The boy went to the door, and upon opening it was confronted with a man whose face was concealed by a handkerchief covering up to his eyes, and tied behind his ears. The boy ran back into the room, followed by the man, who was there met by the defendant's wife. The intruder thereupon shot her, the ball passing through the arm and grazing the side. He then raised the revolver to her head. She struck it aside, and was knocked down. Meantime Asa W. Briggs, who was an invalid, struggled from his chair, fell upon his knees, and grasped the legs of the assailant. He was first pounded by the assailant with the butt of the pistol, and afterwards shot twice. By this time Mrs. Burt and the children had escaped, and the assailant left.

Argued before PARKER, P. J., and HERRICK, MERWIN, SMITH, and KELLOGG, JJ.

C. A. Kellogg, for appellant.

Ledyard P. Hale, for respondent.

SMITH, J. By the judgment of the law this defendant has been condemned to life imprisonment. Grave as this punishment may be, if he be guilty of the crime charged the law has been kinder to him than was he to his victim, and he cannot complain of the justice of its decree. The appellant's counsel challenges the judgment both upon the law and upon the facts. He makes four specifications of error in law:

1. The court, in charging the jury, after having defined what was murder in the second degree, said:

"So that if the evidence in the case satisfies your minds beyond a reasonable doubt that he went there expecting to meet Rhoda Burt and kill her, and, with that purpose accomplished, he intended to flee; that he did not have it in his heart to kill Asa W. Briggs, or, not killing her, or after the assault upon her, he found it essential to get rid of Asa W. Briggs, he did it without any premeditated or deliberated design, but still intending to kill him, as he finds he had to do,—then it may be murder in the second degree."

The complaint made is that under the circumstances the crime would be murder in the first degree. It would seem that the defendant had little cause of complaint of a charge more favorable to him than was his due. The argument of the appellant's counsel, however, is that he gave to the jury the opportunity of finding a compromise verdict of murder in the second degree, whereas, if held strictly to a verdict of murder in the first degree or acquittal, the jury would have found with the defendant. Were the inference legitimate, it would not constitute legal error. No exception was taken to the charge, and no request made that the jury should be instructed that they must bring in a verdict of murder in the first degree or of acquittal. The court had no right to charge, as a mat-

ter of law, that there was premeditation and deliberation. The jury could properly determine whether, under the circumstances, there was an absence of such premeditation and deliberation as would reduce the crime from murder in the first degree to murder in the second degree. They have found, as they could lawfully do, that the crime was murder in the second degree.

2. Shortly after the commission of this crime, one Savage was arrested and charged therewith. Upon his examination, this defendant, who was not even under suspicion by the authorities, was called as a witness in behalf of the people. Upon his cross-examination by the attorney for Savage he was asked to say where he was about the time that the murder was committed, and upon cross-examination and upon redirect examination he gave considerable evidence as to his whereabouts about that time. Upon this trial the testimony which he there gave was offered in evidence by the prosecution, and received under defendant's objection. The exception thus taken is claimed by the defendant to vitiate this judgment. The authorities, however, seem to hold otherwise. See Hendrickson v. People, 10 N. Y. 13, 21; People v. McMahon, 15 N. Y. 384; Teachout v. People, 41 N. Y. 7; People v. Mondon, 103 N. Y. 211, 8 N. E. 496; People v. Chapleau, 121 N. Y. 266, 24 N. E. 469; People v. Kennedy, 159 N. Y. 346, 54 N. E. 51.

3. The theory of the prosecution upon the trial was that the defendant left Potsdam about 5:30 o'clock, and reached his home about 7 o'clock, at which time the crime was committed, and returned to Potsdam, reaching there at about 8:30 o'clock in the evening. Witnesses were allowed to describe a man that they saw on the way coming from Potsdam to the defendant's home, and back from defendant's home to Potsdam, within that time. Some of these witnesses were unable to identify the man, but described certain characteristics, which were not sufficient, however, to identify certainly the man seen as the defendant. The defendant's counsel claims that he was prejudiced by this evidence, admitted, as he claims, erroneously. The evidence is not, however, rendered incompetent by the fact that it is not conclusive. So far as any characteristics were shown, foreign to the defendant, they cannot harm him, and become rather evidence in his favor than against him. So far as characteristics were shown which were the defendant's, they are competent, in connection with the other evidence, to establish, so far as they may, the defendant's guilt.

4. After the shooting the deceased lived for 12 days. Within that time he made an ante mortem statement, which was admitted in evidence, without sufficient proof, as claimed by the defendant, that he was beyond hope of recovery. It is difficult to see how the people could have made better proof. He was told that he must die, and he stated that he knew he must die, of these wounds, and thereupon made the ante mortem statement. This comes within the rule justifying the receipt of such statements in evidence in this class of cases.

But the defendant questions this judgment as well upon the facts as upon the law, and here, to our mind, is found the problem most

difficult of solution. The court of appeals has settled the law which is to guide us in our review of the evidence received upon the trial. If the conviction be that of murder in the first degree, the appeal is direct to that court. In People v. Fish, 125 N. Y. 136, 145, 26 N. E. 320, the opinion reads:

"In the case of People v. Cignarale, 110 N. Y. 23, 17 N. E. 135, Andrews, J., said: 'It is a cardinal principle in our jurisprudence that the jury is the ultimate tribunal for the investigation and determination of questions of fact. It is no more the province of an appellate court, than of the court of original instance, to determine controverted questions of fact arising under conflicting evidence. Neither can lawfully usurp the appropriate function of the jury, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences.' "

In People v. Sliney, 137 N. Y. 570, 33 N. E. 150, the court says:

"Great as is the responsibility imposed upon this court by the statute in capital cases, its extent does not require of us any other duty than to examine the record, and from it to ascertain whether the accused has had a fair trial, and that there was competent evidence from which the jury could justly find the accused guilty of the crime charged."

In People v. Taylor, 138 N. Y. 398, 34 N. E. 275, the rule is stated thus:

"If, in the judgment of this court, there was a rational doubt of the guilt of the defendant, it would not be sufficient ground for reversal. Under our system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment."

In People v. Kerrigan, 147 N. Y. 210, 41 N. E. 494, this rule is again stated:

"It is the province of the jury to determine questions of fact depending upon evidence in any degree conflicting, and to declare by their verdict what the truth is; and when once determined, upon evidence which is sufficient, even though capable of diverse and opposing inferences, this court has no more right than the trial court to substitute its own judgment in the place of that of the jury, or to usurp its legitimate functions."

Applying these rules to the case in hand, we observe that this defendant has had, in every sense, a fair trial. With great ability and strict impartiality the learned trial judge submitted to the jury the various questions for them to determine, and to the charge the defendant's counsel announced in open court that he took no exception. The sole question remains, then, as to whether the evidence of the people was sufficient upon which to find the defendant guilty of the crime, or whether the verdict appears to the court to have been reached by prejudice or passion.

That there was evidence in the case sufficient upon which to base this verdict seems to us demonstrable. These parties appear to have had no enemies. The manner of the commission of the crime rebuts the inference that it was committed for plunder. No motive is apparent in any other human being for its commission. On the contrary, the defendant had the strongest motive,—to rid himself of his wife. He was in love with Edna Delosh, who had worked in the family. This appears, not only from her evidence and the evidence of her father, but also from his own evidence, as appears in the

sentiment written by him in her album. This sentiment ends with these words: "This, Edna dearest, is the wish of the man that hopes some day to be yours. With lots of love, H." This evidence would seem fully to corroborate the testimony of Edna Delosh that his purpose was to rid himself of his wife and marry her. He had proposed first to go West and get a divorce. He evidently concluded that this was the shorter way and the simpler. His preparation for this crime seems unmistakable. On the 29th of October he purchased a revolver and some cartridges. His purchase of this revolver, claimed to have been made for the purpose of killing cats, was kept concealed from his family until long after the crime was committed, as was also its loss, which he now claims. It is true that there is some question as to whether these cartridges were the ones that caused the death. Edna Delosh swears that the cartridges shown to her were like those marked "32," and not like those marked "38," with which, confessedly, the crime was committed. She, however, is not shown to have such familiarity with cartridges as to render at all conclusive her distinction. The cartridges which were used are with fair certainty traced to the store from which the defendant purchased his revolver, as cartridges of a peculiar make, which had not been manufactured since 1890, and which these storekeepers had in stock as a remnant from an old purchase. The purchase by the defendant of this large hat is a significant circumstance. It appears that the criminal's hat was drawn down over his face when the crime was committed. The hat purchased by the defendant was of a size too large for him, which would come well down over his head and face, to make more effectual his disguise. It was claimed to be purchased for "the boy," with which to go into the woods. That hat is claimed by the defendant to have been lost in some way out of the carriage. The handkerchief with which the criminal masked his face is proven to have come from a store in which the defendant was upon the afternoon of the shooting, and from which he had an opportunity to take it. At about 5:30 the defendant was seen to be walking upon the west side of Market street, near the corner of Main street, in the village of Potsdam, in the direction of the bridge, which he must cross to get to his home. He denies that he was at any time before 8 o'clock upon the west side of Market street. At that time he had a package under his arm, which the jury might well have concluded was this hat. Omitting the evidence of those who described a man whom they met on the way from Potsdam to the defendant's home, but who did not identify the defendant, the man who committed the crime appeared at the front door, just off from the hall which adjoined the sitting room, in which the family were sitting. We are asked to infer that it was not the defendant who came there, because it was a door unused by the family. The jury might well have inferred, however, that this door was chosen by the defendant with the expectation that his wife would come to the door, and there in the dark the deed could be committed, and he could escape. When the door was opened no attempt was made to shoot the boy who opened the door. The first shot was fired at Mrs. Burt, and as she passed him she was

knocked down. No shot was fired at any other person until the deceased grappled the assailant around the legs and held him. He was not immediately shot. The assailant first used upon him the butt of the pistol, but, failing to disentangle himself in that way, the shot was fired which caused the death of Briggs. During all this time the assailant was dumb. This circumstance would seem to indicate that it was not a stranger who was committing the murder, but one whose voice would disclose his identity. At 8:25 or 8:30, about an hour and a half after the commission of this crime, this defendant was seen by two men who knew him well to go across the bridge from the direction of his home into the village of Potsdam. And here, to my mind, is the crucial point of this case. Upon the Savage examination, when he was sworn, and thereafter, he has stated positively that he was not upon the west of the bridge that night, except in driving to his home after the crime was committed. If the evidence of Wilber Davis to the effect that he saw him walking towards the bridge from the direction of his home at about 8:25 or 8:30, and the evidence of Jardine to the effect that he saw him upon the bridge about 8:20 o'clock, be true, in connection with the other circumstances of this case, and in the light of the defendant's denial that he was there at any time, we think that the jury was authorized to find that he was guilty of the commission of the crime. With this evidence accords the evidence of Lemon, who was just over the bridge upon Market street, that about that time he saw the defendant going west upon Market street, upon the west side, and he informed him of the rumor that the crime had been committed. Other evidence might be instanced of his attempts to suppress the truth. His evasion upon the witness stand of his ownership of a revolver; his attempts to procure the silence of O'Brien & Maxfield, from whom he purchased it; his attempts to procure evidence of divers persons in the village of Potsdam that he was with them between 6 and 7 o'clock, when in fact he was there before 5:30; his caution to Delosh that he could swear that he came there to see him upon business; his claim generally that he believed that it was Savage who committed the crime, while saying to the law officers, the county judge, and the district attorney that he did not believe it was Savage; his deception which the jury might have found as to his whereabouts upon that night,—all served to enforce the evidence which led to the conclusion reached, that the defendant was the guilty man. We are not unmindful of the strength of the defendant's evidence in this case. Whether he was in Potsdam between 5:30 and 8:30 o'clock is a question which the jury have determined against the defendant's witnesses. What may have been his physical condition—whether he was able to walk the distance of 5.35 miles and return and commit the deed within three hours—was a question for the jury to determine. The fact that no member of his family appears to have recognized the defendant weighs heavily in the scale for the defendant. This fact, however, has a possible explanation in the confusion and excitement of the moment, in the criminal's disguise, in the dimly-lighted room, in the fright, in the wife's fidelity to her husband and to her

children, in the grandfather's age and weakened condition, and his position upon his knees, with his hands grasping the assailant's legs. The grandfather swears that he once looked up, and that "he saw a black mustache. It might, possibly, have been whiskers." That he did not recognize the defendant, however, clearly appears. All of these facts, while cogent in the defendant's behalf to place a reasonable doubt in the minds of the jury, are such as might have been discredited or explained by the jury, and are not sufficient, in our judgment, to show either that the verdict was against the weight of evidence, or that it was influenced by passion or prejudice. We find in the record evidence sufficient, if believed, to give to the jury an abiding conviction, to a reasonable degree of certainty, of the defendant's guilt. The learned trial judge, who had before him all of these witnesses, and to whom the motion for a new trial was first addressed, has approved this judgment as upon sufficient evidence. We do not feel authorized to reverse that conclusion.

Judgment of conviction affirmed. All concur.