THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
MICHAEL T. SLINEY, Appellant.

Upon review here of a judgment of conviction in a capital case, when
there was competent evidence from which the jury could find the
accused guilty of the crime charged, this court will not disturb a ver-
dict reached upon conflicting evidence, unless the review induces a
conviction that injustice was done or errors committed upon the trial
which prejudiced the substantial rights of defendant, and that in the
interests of justice a new trial should be ordered, and this, although a
different conclusion from the evidence was possible.

· Upon the trial of an indictment for murder a physician who had been sent
by the district attorney to ascertain and report as to the sanity of the
defendant, was permitted to testify to admissions made to him by
defendant. *Held,* no error; that the testimony was not within the rule
(Code Civ. Pro. § 834) prohibiting the disclosure by a physician of
information acquired while attending a patient in a professional capacity.

(Argued February 3, 1893; decided February 10, 1893.)

APPEAL from judgment of the Court of Oyer and Terminer
in and for the city and county of New York, entered upon a
verdict June 28, 1892, convicting defendant of the crime
of murder in the first degree.

The following is the opinion in full:

"The defendant was indicted, jointly with James Lyons,
for the crime of murder in the first degree, in the kill-
ing of Robert Lyons. The defendant has been tried upon the
charge, and his trial has resulted in the verdict of the jury
finding him guilty. Upon his appeal to this court from the
judgment of conviction, his counsel has argued the insufficiency
of the proofs adduced by the People to establish the truth of
the indictment, or that the killing was committed from a delib-
erate and premeditated design to effect the death of the
deceased. We think the evidence was quite sufficient to sup-
port the finding of the jury, and though opposing inferences
were open to them, nevertheless, a contrary finding would not
have been as well warranted, or as rational. Upon the review
of the judgment, this court should not, and will not, disturb a
verdict reached upon conflicting evidence, unless such a review
induces a conviction that, in the proceedings upon the trial,
injustice has been done, or errors have been committed, which

have prejudiced the substantial rights of the accused, and that, in the interests of justice, a new trial should be ordered. But, in the absence of such reasons, our judgment will not be moved adversely to the conviction, because, upon the evidence given, a different conclusion was possible. Great as is the responsibility imposed upon this court by the statute in capital cases, its extent does not require of us any other duty than to examine the record and from it to ascertain whether the accused has had a fair trial, and that there was competent evidence from which the jury could justly find the accused guilty of the crime charged. Our duty ends when that has been ascertained, and the judgment must then stand.

" In this case no one saw the blow struck, which deprived the deceased of his life, but the circumstances disclosed by the evidence of witnesses, in connection with some admissions and statements by the defendant, leave no room for doubt that it was the act of the defendant, and that the act was deliberate and with intent to kill. A review of some material portions of the evidence in this record will suffice to establish this.

" The deceased kept a butcher shop in Cherry street, in New York city, and on Wednesday afternoon, November the 25th, 1891, between four and five o'clock, he died from the effect of a wound about six inches in length and three inches in depth, extending, upon the back of his head, from the angle of the right jaw to between the two top vertebræ, and severing the tendons to which the muscles are attached that hold the head in position. It was testified by the physician who made the autopsy that, from the conditions apparent, the blow, inflicting this terrible wound, must have been delivered with great force from behind, and through a heavy instrument, such as would be a butcher's cleaver.

" The mother of the deceased testified that about four o'clock she went from a rear room into the shop, to send the boy in their employ upon an errand ; but found him busy with the deceased, tying up chickens. Returning there, in a few minutes, she saw the defendant alone in the store with the deceased. To her inquiries about the boy's whereabouts, the defendant answered, saying " he had gone to the priest's house." She went into the back room, and the door into the

shop being open, the defendant called out to her : " Shut the
door ; there is a rat gone in there." She did so. In a very
few minutes her son, the deceased, came to the door, bleeding
from his neck, fell upon the floor and very soon expired.
Later in the afternoon, she testified, the defendant was
brought to the shop by the police officers, and, in a conversa-
tion between her and the defendant, in reply to his question,
'is it me, Mrs. Lyons?' she said: 'You; I had his dying
words for it.' To which, according to her evidence, he
made no reply. A witness, Nellie Burke, a young girl
residing next door, testified that she was sent to the shop,
about four o'clock, to buy some meat and saw there the
defendant, the boy and the deceased, and no others. The
defendant stood by the cleaving block and had the cleaver in
his hand. Not obtaining the meat desired, she left; but
returned about twenty to twenty-five minutes after four o'clock
to buy some chops and then saw deceased lying on the floor,
all cut, and with a cleaver by his head. A witness, Loretta
Collins, testified that she went to the shop about ten minutes
after four to buy meat and saw there only the defendant,
the boy and the deceased. The defendant was by the chop-
ping block and had the cleaver in his hands. The deceased
handed a note to the boy and told him to take it to Father
Kean. When she left, after a few minutes, the boy followed
her out of the shop. The boy, whose name was Hronish, tes-
tified that the defendant came into the shop at ten minutes
before four and asked him if he could go on an errand ; and
he answered that he could do so, when through with tying up
the chickens. He said that the defendant spoke to deceased
and they left the shop together ; that upon their return the
defendant, after looking up and down the street, went across
the street to his house ; that the deceased again went out and
subsequently came in with defendant, holding a piece of
paper ; that the latter stood by the block, chopping it with
the cleaver ; that the deceased gave him, the witness, a note
for Father Kean, telling him to take it ; which he did, follow-
ing the girl Loretta Collins out of the store, and leaving the
defendant alone with deceased. This note was in red ink and
read : 'ples send up boy to vestry, right way. Rev. John

Kean,' and it was proved to have been forged by the defendant. The proof was in the testimony of Father Kean that he had not written it; in an admission of the defendant to police officers, when inquired as to a red stain discovered upon his fingers at the time of his arrest, that it was ink and that he had written a note that afternoon; in the finding of some red ink in his house; in his admission in a statement, testified by Superintendent Byrnes to have been made to him, and by expert evidence. I may mention here that, subsequently, upon his own examination, he admitted that he had written it; stating, however, that it was written upon the previous Monday for James Lyons and given to him. It was further shown by the witness Mary Maier, residing near by, that about the time of the murder she had observed the defendant walking up and down on the sidewalk in front of her door; then crossing over the street and entering the shop of the deceased and, after a few minutes, coming out very quickly and passing down the street between some wagons.

" From the evidence of these witnesses, who, except as to the mother of the deceased, were apparently disinterested, it was shown that for a few minutes after four o'clock the defendant was alone in the shop with the deceased and by his own contrivance, and that in that period of time the deceased had come to his death in a manner which, as described, indicated the giving of a violent blow with a heavy sharp instrument and from behind. A police officer, who was taking the defendant to the station house, upon his arrest within an hour of the discovery of the murder, testified to a conversation on the way; in which defendant stated that he had gone into the shop to collect a bill of $35, which the deceased owed him for some coal; but had failed to get the money. He stated, in answer to the officer's question as to when he left Lyons that afternoon, that it was 'about ten minutes after four.' To the witness Byrnes, Superintendent of Police, a few days after the murder, he denied any knowledge of the matter; but, in March following, in a second interview, he made a voluntary statement, that he was going to tell the truth and, after telling of a quarrel between the deceased and his mother, the day before the murder, went on to state that

he returned the next afternoon at four o'clock for the purpose of getting some money that was owing him from the deceased; and, not getting it, had left; but, subsequently, returned to the shop to borrow a dress suit from the deceased; that, as he stepped inside, James Lyons came out of another room, holding a cleaver, covered with blood; that the deceased was following him bleeding from his head and neck; that a man standing near the icebox called out 'Jimmie, there is Sliney,' and then jumped into the box; that he, the defendant, thereupon went out; that he was followed by James Lyons, who begged him to say nothing about the affair and offered to give him $5,000; that he made no reply to him, but continued on his way; that when he came home and learned that the police officers were looking for him, he gave himself up. Being confronted by the Superintendent with James Lyons, the defendant charged him with the killing; to which he replied denying it and saying to the defendant that he should not tell a lie like that. In a third interview with the Superintendent, about April first, the defendant being sent for, in order to be asked about some facts in connection with his previous statement, said, 'I want to make another statement about this crime; what I said heretofore is not true.' The Superintendent was surprised, and, thereupon, sent for a stenographer and secured the attendance of several persons in the room. The defendant then made a long statement, which, in substance, was that, in the morning, he and the deceased had had a quarrel; that when he asked for some moneys owing to him, the deceased had abused him, knocked him down and kicked him; that he then ran away, that about ten minutes to four o'clock he returned and he and the deceased went out to take a drink; that they came back and, upon his again asking for the money, the deceased again abused him and knocked him down and kicked him and threatened him with a carving knife; that he got up and running to the chopping block, 'grabbed' up the cleaver, and, believing his life in danger, 'fired' the cleaver at him, striking him in the back of the neck; that he then ran away to his mother's and from there went to attend to some job and that, upon his return, hearing

he was being looked for, gave himself up to the police officers. Being asked by Byrnes about the letter to Father Kean, he said he wrote it and gave it to the deceased, as they were coming out of the liquor store to go into the shop, for the last time. Witness Byrnes said that the defendant did not give any reason for writing the note, so far as he remembered, or so far as his notes showed. He also said that upon the previous occasions the defendant had denied knowing anything about the note. He told the Superintendent that he made the statement for the purpose of exonerating an innocent man. It was testified by the police officers that when defendant was brought to the station-house, that afternoon, there was neither mark nor bruise upon his person, nor any appearance of torn or dirty clothes, and that he made no mention of any assault having been made upon him. The People also gave evidence, through several witnesses, to show that James Lyons, the brother of the deceased, who had been suspected and whom the defendant sought to implicate in the matter, for several hours before the killing and until some minutes after its occurrence, was not at or near the shop. One of the policemen testified that he met James Lyons coming along the street after the murder and informed him of it. A witness testified to James having been with him all the time from half-past ten in the morning, until the moment the officer met them and told of the murder. His testimony was corroborated, more or less strongly, by that of several other witnesses, who saw them together at different times and places in the day; and it accords with the evidence of the mother concerning what persons were in the shop.

" The defendant gave very considerable evidence as to his previous good character and reputation for peace and quietness. He brought witnesses, to show by their testimony that he could not have been in the shop at the time of the killing. He testified in his own behalf and denied having killed the deceased, or having quarrelled with him, and, with respect to the note of Father Kean, that on the previous Monday James Lyons was in defendant's room trying to borrow money and asked him to write the note in question, in order that he

might get the boy out of the shop and so could get some money from his mother, while his brother was busy in the front part of the shop. His evidence went to show the existence of bad feeling between the deceased and his brother, and also his mother, growing out of the exclusion of James from the business and of a dislike to the wife of the deceased. He admitted going to the shop about four o'clock and seeing the deceased and his boy busy with the chickens; that the deceased put off paying the moneys due him; that they went out and drank together, and that while in the shop he was holding the cleaver. He testified that he needed a dress suit to attend a wedding that evening, and had returned to the shop to borrow that of the deceased, and repeated the story, told to Superintendent Byrnes in the second interview, about opening the door and seeing James with the cleaver in his hands followed by the deceased, bleeding from the neck, and about the strange man who called out and then jumped into the ice box. Seeing this condition of affairs, he says that he closed the door and went off; that he was followed by James, who endeavored to bribe him into silence with an offer of $5,000. He said that he went into a store, took a raffle for a turkey and then helped at a job of removing ashes, etc., and, upon returning to his home soon after five and hearing that the officers wanted him, gave himself up to the police. He testified that his statement to Superintendent Byrnes about his quarrel with deceased and of killing him in self-defense was false, and that he had made it because influenced and instructed by James Lyons to do so, while in the prison, and that his previous statement to Byrnes incriminating James Lyons was the truth about the matter. He made denials as to those matters testified to by the witnesses for the People which went to show admissions made by him at the time of his arrest, or which were incriminating. When interrogated about making the last statement to Superintendent Byrnes, he said that he had made it because he believed that James Lyons, when he got out, would get him off on a plea of manslaughter, and, with his (James') father's money, which he expected to have very soon, could get him free. Defendant

said his lawyers were to be paid by James, but he was not to get a cent.

"In rebuttal, the People gave evidence further establishing the fact that James Lyons was absent from the shop all day, and contradicting the defendant in many particulars of his testimony.

"They put a physician upon the stand, who had been sent by the district attorney to see the defendant, in June following. He testified that he entered into conversation with the prisoner, for the purpose of ascertaining his mental condition, and that during the interview the defendant gave him a long account of how he and deceased had had an altercation and a struggle, in which he struck him with a cleaver; but did not know he had killed him.

"This review of the evidence shows that the prosecution gave evidence tending to establish that defendant was alone with the deceased after four o'clock upon the afternoon in question; having caused the boy to be sent away upon a letter forged by him and having gotten the mother out of the shop; that a butcher's cleaver was in his hands; that he had come there to collect some money but was unsuccessful; that a few minutes after having been left alone with the deceased, he ran quickly from the shop; that the autopsy revealed a wound of such severity and dimensions, as only a heavy instrument like a cleaver could have inflicted, and that, from the appearance of the wound, it must have been given from behind, and that the instrument must have been drawn from the wound, as by the act of one striking with it, and could not have been thrown at the deceased. The evidence for the defense, though conflicting in many respects, in some important details is more or less corroborative of what was sought to be established by the prosecution; notably, in the forgery of the note, in the demand for moneys owing, and with respect to time. Proof of the elements of an intent to kill and of deliberation and premeditation in the killing was furnished, in evidence as to the peculiar nature of the wound inflicted, which would seem to show the blow to have been delivered from behind the deceased and by a heavy instrument in the hands of some one; in evidence showing the

removal of the boy from the scene by the device of the forged letter and of the mother by the pretext about the rat; in evidence that the defendant was standing by the cleaving block with the cleaver in his hands, and that the defendant had unsuccessfully endeavored to collect a debt from the deceased. The evidence, in connection with the voluntary confession made to the witness Byrnes that he had killed the deceased, though claimed to have been the result of a quarrel, was sufficient, if believed by the jury, to make out a case of a killing with deliberation and premeditation and to negative the theory of a killing in self-defense. The intent to kill, generally, if not always, is established by an inference from the circumstances. As an operation of the mind, the outward evidence of the formation of the intention will be found in the circumstances preceding and attendant upon the act done. We have the right to draw the inference of intent from the nature of the wound and to rest upon the rule of presumption that a man intends the natural consequences of his act. While it may not be easy to assign a motive for the act of the defendant, the evidence connecting the defendant with the commission of the crime is not of that doubtful and unreliable character, which makes the evidence of motive an essential part of the People's case. There is some evidence to show motive, however; whether we take the defendant's statement of the abuse and the assault upon him by the deceased in the morning and afternoon; or whether we consider the inability to collect a debt. There is also some evidence tending to show that the defendant was most intimate with James, the brother of deceased; that James was constantly wanting money and borrowed from him; and that he may have been instigated by James to kill the deceased; in which event James would be very much benefited in fortune. According to the evidence given by the defendant, James had suggested to him 'to take deceased out in a wagon and do him up.' However the truth may be about these matters, the circumstances detailed in the evidence seem such as to fully warrant the jury in believing that the defendant had killed the deceased intentionally and in cold blood and, that being so, the absence of satisfactory proof of motive is not

material. The theory, which the defense endeavored to establish, was that James Lyons had killed his brother; as the outcome of family quarrels and of disputes about money matters and as the result of the conduct of the deceased in excluding James from participation in the management of the business. The evidence adduced in aid of that theory, in connection with abundant proof of his previous good and peaceable character, the defendant laid before the jury. They did not believe him, however, and, in our judgment, they were justified in discrediting his evidence. It was not only in conflict with the incriminating evidence of witnesses, who could have no motive to testify falsely against the defendant; but it was seriously impaired by the evidence of many facts establishing its utter improbability, and by the inconsistencies of defendant's conduct and the contradictions in his several statements. His statement of his conduct was most unnatural; as shown by his calmly going, after witnessing the dreadful scene through the shop door, to raffle for a turkey, though followed by James Lyons, who begged him not to tell about the matter, and offered the bribe of $5,000. And yet it was one of his companions who was in question. His voluntary statements to Superintendent Byrnes were absolutely contradictory, and the last statement admitting the killing, while true as to that fact, was hardly credible as to the excuse of an assault, a struggle and of a killing in self-defense. His testimony as to how he came to make the statement to Byrnes, that he did not want to see an innocent man punished for a crime he had committed, and that it was made by Lyons' instruction and upon his promise to get him off upon the plea of manslaughter and, when James got out of prison, of subsequently being freed by him, is absolutely unintelligible. Its absurdity is evident from the conditions testified to; that he was to go to prison and James Lyons was to get out and to pay his lawyers what was owing to them and would then get him freed. That James Lyons committed the killing was an inference from the evidence, which the jury were at liberty to draw; but to do so would have required a great stretch of belief in the defendant's evidence and a disregard of very considerable testimony, tending to show the absence of James

from the scene.   That testimony was not so improbable on its face as to invite the scepticism about its truthfulness, which sometimes accompanies the evidence to sustain the plea of an alibi.   His companion during the day gave an account of his whereabouts, which was corroborated by several apparently disinterested witnesses, who saw them together at different hours, and by the police officer who, having just left the scene of the murder, meets them and informs James of the occurrence.

" We have given a very careful consideration to this record and we are satisfied that the jury reached the true conclusion upon the evidence, that the defendant killed the deceased deliberately and premeditatedly and, therefore, was guilty of the crime with which he was charged in the indictment.

" The defendant's counsel argues that there was error in permitting the physician, who visited the defendant in the prison, to testify to what the defendant stated to him about the matter of the killing.   The objection to this evidence went to its competency, as disclosing a communication from patient to physician which is privileged under the statute. The answer is that no such relation existed.   The physician was sent by the prosecuting authority to make a report upon the sanity of the prisoner.   He acquired no information while attending a patient, and was not acting as the professional adviser of defendant.

" The defendant's counsel says that the trial judge in his charge misstated some facts ;  but the particular misstatement alleged was quite unimportant in its relation to the case and could not have prejudiced the defendant ; especially in view of all the proof in the case upon the subject.   The other comments upon other portions of the charge are quite unwarranted. The strictures upon the conduct of the defendant were not unjust and were called for by its extraordinary and sometimes unintelligible character.

" It may be quite possible to detach phrases and to make them appear either singular, or of such character as to subject them to hostile comment.   When the remarks in question are read with the context, they appear as legitimate comments upon the evidence, presenting it in a light to enable the jury

to appreciate its probative force and to give it due effect. They did not invade the province of the jury, nor prevent them from judging upon the facts disclosed by the evidence according to their own beliefs about them. The trial judge was most careful and correct in instructing the jury upon the law and in charging them that they were to give to the defendant the benefit of every reasonable doubt. He told them that they were the sole judges of the facts and that they were not to regard his opinions about them.

" We find no errors in his rulings, or in his charge, and the judgment should be affirmed."

*Frederick B. House* for appellant.

*Henry B. B. Stapler*, for respondent.

GRAY, J., reads for affirmance.
All concur.
Judgment affirmed.