OPINION OF THE COURT
Garni, J.
The issue presented for our consideration is as follows: When a physician conducts a medical examination in the context of a personal injury action on behalf of an alleged tortfeasor or his or her insurer and, in the course of doing so, affirmatively injures the examinee, should the examinee’s cause of action against the examining physician to recover damages for that injury be characterized as one to recover damages for medical malpractice, or rather, one to recover damages for “simple” negligence?[1] For the reasons that follow, we conclude that the cause of action is to be characterized as one to recover damages for simple negligence.
In 1998, the plaintiff, Lewis J. Bazakos, allegedly was injured when the vehicle that he was driving was “rear-ended” by another vehicle. After the accident, Bazakos commenced an action against the other driver, seeking to recover .damages for his injuries.
*17 On November 27, 2001, Bazakos was required to appear at the offices of the defendant Philip Lewis, an orthopedic surgeon licensed to practice medicine in New York, who had been selected to perform a statutory medical examination (see CPLR 3102 [a]; 3121; 22 NYCRR 202.17) on behalf of the alleged tortfeasor in connection with the lawsuit. According to Bazakos, during the statutory medical examination, Lewis “took [his] head in his hands and forcefully rotated it while simultaneously pulling.” In addition, according to Bazakos, this “physical action caused [him] personal injury.”
Approximately two years and 11 months after the statutory medical examination took place, Bazakos commenced the instant action against Lewis. Alleging that Lewis “committed negligence toward” him during the statutory medical examination, Bazakos sought to recover damages for the alleged injuries caused by that “negligence.”
Lewis then moved pursuant to CPLR 3211 (a) (5) to dismiss the complaint insofar as asserted against him as time-barred. In support of his motion, Lewis asserted that while Bazakos might have alleged that the instant action was one to recover damages for negligence, and hence, subject to a three-year statute of limitations (see CPLR 214 [5]), the action was, in actuality, one to recover damages for medical malpractice, which is subject to a 2V2-year statute of limitations (see CPLR 214-a). In opposition, Bazakos asserted that he was never in a physician-patient relationship with Lewis because he only saw Lewis in the context of a statutory medical examination, and contended that it necessarily followed that his claim sounded in negligence, as opposed to medical malpractice.
In the resultant order, the Supreme Court agreed with Lewis that the instant action was “founded on medical malpractice.” Accordingly, the court granted Lewis’s motion to dismiss the complaint. We reverse.
It is well settled that the essence of a medical malpractice action is the existence of the duty which arises from the physician-patient relationship (see Caso v St. Francis Hosp., 34 AD3d 714 [2006]; Mendelson v Clarkstown Med. Assoc., 271 AD2d 584 [2000]; Lippert v Yambo, 267 AD2d 433 [1999]; Chaff v Parkway Hosp., 205 AD2d 571 [1994]). *18 Contrary to Lewis’s contention, the determination as to whether an action sounds in medical malpractice does not depend upon the need for expert testimony (see Payette v Rockefeller Univ., 220 AD2d 69, 74 [1996]; Stanley v Lebetkin, 123 AD2d 854 [1986]; but see Miller v Albany Med. Ctr. Hosp., 95 AD2d 977 [1983]; Hale v State of New York, 53 AD2d 1025 [1976]; Mossman v Albany Med. Ctr. Hosp., 34 AD2d 263 [1970]).
*17 “[M]alpractice in the statutory sense describes the negligence of a professional toward the person for whom he rendered a service, and ... an action for *18 malpractice springs from the correlative rights and duties assumed by the parties through the relationship. On the other hand, the wrongful conduct of the professional in rendering services to his client resulting in injury to a party outside the relationship is simple negligence” (Cubito v Kreisberg, 69 AD2d 738, 742 [1979], affd 51 NY2d 900 [1980] [emphasis added]).
Cast in this light, the time has come to acknowledge the essential nature of the relationship inherent in the performance of a statutory medical examination, pursuant to 22 NYCRR 202.17, by a physician retained and paid by a defendant’s insurance carrier to assist in the defense of a personal injury action and the duty that flows to a party outside that relationship—in this case a personal injury plaintiff.[2] It is beyond cavil that a statutory medical examination is an adversarial process. The examinee’s attendance is compelled by rule of law (see 22 NYCRR 202.17), and his or her engagement and interaction with the examining physician is nonconsensual. Indeed, because of the inherently adversarial nature of these types of examinations, this Court long ago recognized the examinee’s right to be examined in the presence of his or her attorney (see Ponce v Health Ins. Plan of Greater NY., 100 AD2d 963 [1984]). In stark contrast, the physician-patient relationship is characterized by the confidentiality and trust necessary to facilitate the securing *19 of adequate diagnosis and treatment (see CPLR 4504; Matter of Grand Jury Investigation in N.Y. County, 98 NY2d 525 [2002]). Critical to a finding of a physician-patient relationship is the consensual nature essential to the formation of the relationship. “The relationship is created when the professional services of a physician are rendered to and accepted by another person for the purposes of medical or surgical treatment” (Lee v City of New York, 162 AD2d 34, 36 [1990] [“The physician-patient relationship is a consensual one”]).
Here, there is no dispute that Bazakos did not expect, seek, or receive medical treatment or diagnosis from Lewis. Nor does Lewis contend that Bazakos consulted him as a health care provider.[3] Under similar circumstances, this Court recently recognized that the touchstone of the formation of a physician-patient relationship giving rise to a medical malpractice cause of action is the expectation and receipt of medical services by the plaintiff for a medical condition (see Sosnoff v Jackman, 45 AD3d 568 [2007], lv dismissed 10 NY3d 885 [2008]). Likewise, in refusing to apply the medical malpractice statute of limitations to a participant in an experimental diet study, the Appellate Division, First Department, in Payette v Rockefeller Univ. (220 AD2d 69, 72 [1996]), stated:
“[N]one of the circumstances essential to a cause of action in malpractice, especially the existence of a physician-patient relationship, are present in the instant matter. In her complaint, plaintiff makes no claim of [the defendant’s] malpractice in furnishing medical treatment. It is also clear that plaintiff did not consult [the defendant] as a health care provider. Nor did she undergo, as part of any medical treatment, the procedures complained of, i.e., the multiple injections of isotopes of iodine, which she contends were three times the amount approved by [the defendant’s] Board of Directors in its protocol. The fact that medical doctors examined and evaluated plaintiff and made notations in [the defendant’s] hospital chart as to plaintiff’s medical reac-
*20 tion to the diet does not, by itself, indicate the existence of a physician-patient relationship.”
Thus, the threshold and dispositive issue is whether a physician-patient relationship exists between the examinee and the physician. The relationship defines the duty. The duty does not define the relationship. Put another way, the threshold determination of whether a physician-patient relationship exists is based upon the expectations of the parties during the course of the encounter. The Court of Appeals has recognized for more than a century that no physician-patient relationship arises from an examination rendered at the request and on behalf of an adversary in the litigation context (see People v Sliney, 137 NY 570 [1893]). This Court recently held that “[a] physician-patient relationship does not exist where the examination is conducted solely for the purpose of rendering an evaluation for an insurer” (Savarese v Allstate Ins. Co., 287 AD2d 492, 493 [2001]).
Here, there is no “patient” at all in this relationship—only an “examinee” compelled to participate because of the rules pertaining to pretrial discovery and disclosure in personal injury actions. The examining physician’s duty not to affirmatively injure the examinee during the evaluation is adequately and appropriately embraced within a simple negligence cause of action. The examining physician is not engaged in diagnosis and treatment on the examinee’s behalf. The evaluation is performed for the benefit of the defendant, defense counsel, and the defendant’s insurance carrier, not the examinee. Thus, the examining physician has no duty to the examinee even to so much as properly evaluate and report upon the injuries, disabilities, or injury causation issues extant in the litigation (see Savarese v Allstate Ins. Co., 287 AD2d 492 [2001]). Indeed, it is well settled that an examining physician has no duty to an ex-aminee to properly diagnose any condition revealed during the examination (see LoDico v Caputi, 129 AD2d 361 [1987] [examining physician not liable to examinee for failure to properly diagnose a brain tumor]).
Wishing to avoid liability for having failed to properly diagnose a brain tumor during the plaintiffs statutory neurological examination, the examining neurologist in LoDico submitted an affidavit averring that “he examined the plaintiff at the request of the workers’ compensation carrier; that the examination was not conducted for the purpose of treatment or diagnosis; and, therefore, there was no physician-patient relationship sufficient *21 to support a claim for medical malpractice” (LoDico v Caputi, 129 AD2d at 363). The Appellate Division, Fourth Department, agreed. Yet the defendant in this case, secure in the knowledge that the statute of limitations for medical malpractice has expired, contends that his conduct constituted medical treatment or bore a substantial relationship to medical treatment so as to receive the benefit of the shorter medical malpractice period of limitations. We find it irreconcilable that, on the one hand, the examining physician should have the benefit of asserting the absence of a physician-patient relationship when he or she seeks to avoid medical malpractice liability for negligently failing to diagnose, yet, on the other, when it suits his or her purpose, assert that he or she was “diagnosing” or “treating” the examinee through “hands on” manipulation so as to obtain the benefit of the shorter period of limitations.
Notwithstanding the absence of a physician-patient relationship, Lewis seeks the protection provided by the shorter period of limitations contained within CPLR 214-a. A review of the legislative history of CPLR 214-a makes it clear that the period of limitations for medical malpractice actions was shortened as part of a comprehensive legislative overhaul to deal with “the critical threat to the health and welfare of the State by way of diminished delivery of health care services” (Mem of State Exec Dept, 1975 McKinney’s Session Laws of NY, at 1599 [emphasis added]) and to “assure the public the basic protection to which all patients are entitled” (Governor’s Mem approving L 1975, ch 109, 1975 McKinney’s Session Laws of NY, at 1739-1740 [emphasis added]).[4] Indeed, in 1985 the Court of Appeals instructed that the analysis of whether a particular claim sounds in negligence or medical malpractice must be cast in the light of the legislative intent in shortening the statute of limitations in order to maintain “ ‘the adequate delivery of health care services’ ” (Bleiler v Bodnar, 65 NY2d 65, 68 [1985], quoting Mem of State Exec Dept, 1975 McKinney’s Session Laws of NY, at *22 1602).[5] The shortening of the medical malpractice period of limitations clearly did not have, as one of its salutary purposes, the intent of providing a significant litigation advantage to physicians not engaged in providing health care services, but instead engaged in business relationships structured to provide expert witness services to insurance carriers in the defense of personal injury litigation.
Lewis’s provision of the statutory medical examination service to his client, the insurance carrier, which allegedly resulted in injury to the plaintiff, with whom he had no physician-patient relationship, is simple negligence (see Cubito v Kreisberg, 69 AD2d 738, 742 [1979], affd 51 NY2d 900 [1980]). A physician-patient relationship does not exist where, as here, the examination is conducted solely for the purpose of rendering an evaluation as a litigation support service for an insurer (see Savarese v Allstate Ins. Co., 287 AD2d 492, 493 [2001]). To the extent that any prior decisions of this Court hold or indicate to the contrary (see Evangelista v Zolan, 247 AD2d 508 [1998]), they are not to be followed.
Accordingly, we find that the instant action, which was commenced less than three years after the statutory medical examination, is not time-barred (see CPLR 214). The order of the Supreme Court is reversed, on the law, and the motion of the defendant Philip Lewis pursuant to CPLR 3211 (a) (5) to dismiss the complaint insofar as asserted against him as time-barred is denied.
Covello, J., dissents and votes to affirm the order appealed from with the following memorandum, in which Santtjcci, J., concurs.
When a physician performs what is commonly known as an “independent medical examination” (hereinafter IME), [1] and, in *23 the course of doing so, affirmatively injures the examinee, the examinee’s cause of action against the IME physician to recover damages for that injury should be characterized as one to recover damages for medical malpractice. Indeed, well-reasoned and long-standing case law from this and other appellate courts supports this conclusion. In light of this precedent, as well as principles of stare decisis, I must respectfully dissent.
As the majority notes, it is fundamental that in order to maintain a cause of action to recover damages for medical malpractice, the plaintiff must have been in a physician-patient relationship with the defendant physician (see Jacobs v Mostow, 306 AD2d 439 [2003]; White v Southside Hosp., 281 AD2d 474, 475 [2001]; von Ohlen v Piskacek, 277 AD2d 375 [2000]; Heller v Peekskill Community Hosp., 198 AD2d 265 [1993]; Lee v City of New York, 162 AD2d 34, 37 [1990]; Murphy v Blum, 160 AD2d 914, 915 [1990]; Hickey v Travelers Ins. Co., 158 AD2d 112, 116 [1990]). After all, “malpractice, in its strict sense, means the negligence of a member of a profession in his [or her] relations with his [or her] client or patient” (Cubito v Kreisberg, 69 AD2d 738, 742 [1979], affd 51 NY2d 900 [1980]).
It has been said that a physician-patient relationship, which is a consensual relationship, would exist where a physician’s “professional services” are “rendered and accepted by another person for purposes of medical or surgical treatment” (Heller v Peekskill Community Hosp., 198 AD2d at 265; see Lee v City of New York, 162 AD2d at 36; United Calendar Mfg. Corp. v Huang, 94 AD2d 176, 179 [1983]; see also Sosnoffv Jackman, 45 AD3d 568, 571 [2007]). Yet, when it comes to IMEs, a person is being examined because, as the majority puts it, he or she has been “compelled” to attend the examination. Indeed, various statutes and regulations require a person whose condition is at issue to submit to a medical examination demanded by a third party, such as: a party against whom the person has commenced a personal injury action (see CPLR 3121 [a]; 22 NYCRR 202.17 [a]); the person’s no-fault insurance carrier (see 11 NYCRR 65-1.1 [d]; 65-3.5 [d]); or the person’s employer’s workers’ compensation insurance carrier (see 12 NYCRR 300.2 [d] [1]). Thus, it is obvious that the examinee is not seeing the IME physician—who has been retained by a third party for that party’s benefit—for the purpose of being healed through medical or surgical treatment.
Considering all of this, one might be inclined to conclude that an IME physician can never be in a physician-patient relation *24 ship with the examinee.[2] However, certain cases from this Court (see Evangelista v Zolan, 247 AD2d 508 [1998]), and the other departments of the Appellate Division (see Smith v Pasquarella, 201 AD2d 782 [3d Dept 1994]; Violandi v City of New York, 184 AD2d 364 [1st Dept 1992]; Twitchell v MacKay, 78 AD2d 125 [4th Dept 1980]), support the proposition that the examinee and the IME physician are indeed in a physician-patient relationship. This relationship, though, is only a “limited” one, and merely imposes a duty upon the IME physician to conduct the IME in a manner that does not affirmatively injure the examinee.[3] Thus, if the IME physician improperly manipulates the ex-aminee during the examination, and the examinee suffers injury as a result, the examinee’s cause of action against the IME physician to recover damages for that injury is one to recover damages for medical malpractice.
In Twitchell, the plaintiff examinee alleged that the defendant IME physician improperly manipulated his injured knee during the course of the examination (see Twitchell v MacKay, *25 78 AD2d at 126, 129). The Court concluded that the case was “a medical malpractice case” {id. at 129). In support of its determination, the Court found as follows:
“[The examinee] would have us apply the narrow test of treatment by a physician, or examination for the purposes of treatment, in order to find that a case involves medical malpractice instead of simple negligence. We decline to do so. Such an interpretation is too constricting and fails to recognize the realities of the relationship that arise, however briefly, when a physician is in the process of exercising his [or her] profession and utilizing the skills which he [or she] has been taught in examining, diagnosing, treating or caring for another person.
“Here, [the examinee] went to [the IME physician], albeit at the request of [the examinee’s disability insurance carrier], for the purposes of an examination. The [examinee] knew that he was seeing a doctor and must have been aware of the fact that the doctor, after the examination, would express his medical judgment to [the carrier. The IME physician] was acting as a doctor and in doing so he agreed to perform his common-law duty to use reasonable care and his best judgment in exercising his skill, and the law implies that he represented his skill to be such as is ordinarily possessed by physicians in the community. Thus, if he carried out his function in a negligent or improper fashion the fact remains that the legal concept for any malfeasance or misfeasance by [the IME physician] would quite properly fall under the label of medical malpractice” {Twitchell v MacKay, 78 AD2d at 128-129).
The Court was aware of the principle that a cause of action to recover damages for medical malpractice does not lie in the absence of a physician-patient relationship (see Lee v City of New York, 162 AD2d at 37; Murphy v Blum, 160 AD2d at 915; Hickey v Travelers Ins. Co., 158 AD2d at 116), as the examinee there argued that “there [could] be no claim for medical malpractice” because “no physician-patient relationship existed” (Twitchell v MacKay, 78 AD2d at 127). The Court also noted ■that a “relationship . . . arise[s]” whenever a physician is “examining [and] diagnosing . . . another person” (Twitchell v MacKay, 78 AD2d at 128). Under these circumstances, it is *26 clear that the Court determined that a physician-patient relationship existed between the examinee and the IME physician. It is also clear that the Court found that this relationship only placed a duty on the IME physician to avoid conducting the examination “in a negligent or improper fashion,” and that a breach of this duty causing injury would provide the examinee with a cause of action “fall[ing] under the label of medical malpractice” (Twitchell v MacKay, 78 AD2d at 129; see also LoDico v Caputi, 129 AD2d 361, 363 [1987] [indicating that a cause of action to recover damages for medical malpractice would lie if an examinee “suffered . . . bodily injury during the course of’ an IME]).
In Violandi v City of New York (184 AD2d 364 [1992]), the plaintiff examinee, a police officer who was injured in the line of duty, submitted to an IME that was conducted at the request of the New York City Police Department (see Violandi v City of New York, 184 AD2d at 364). He took issue with the defendant IME physician’s recommendation that he be returned to light duty (see Violandi v City of New York, 184 AD2d at 364-365). Although Violandi did not involve the situation involved in the instant case, that is, one involving an affirmative injury during an IME, the Court, citing Twitchell, stated, albeit in dicta, that a “doctor-patient . . . relationship would certainly exist” if, “during [the] examination,” there was “physical manipulation” that “exacerbate [d] the [underlying] injury” (Violandi v City of New York, 184 AD2d at 364). The Court therefore recognized that, to some degree, a physician-patient relationship exists between the examinee and the IME physician.
In Smith v Pasquarella (201 AD2d 782 [1994]), the plaintiff examinee alleged that during the IME, the defendant IME physician, among other things, “forc[ed] [her] injured leg into a position that caused undue and excessive pain,” and also “moved [her] foot in a manner that was likely to aggravate her injury” (Smith v Pasquarella, 201 AD2d at 783). Although the Court did not specifically state that the examinee and the IME physician were in some sort of physician-patient relationship, the Court, citing Twitchell, concluded that even though the examination “was not conducted during the course of treatment,” the abovementioned “conduct” could “constitute [ ] malpractice” (Smith v Pasquarella, 201 AD2d at 782-783), which, once again, can only occur in the context of a physician-patient relationship (see Lee v City of New York, 162 AD2d at 37; Murphy v Blum, 160 AD2d at 915; Hickey v Travelers Ins. Co., 158 AD2d at 116).
*27 Finally, a decade ago, this Court decided Evangelista v Zolan (247 AD2d 508 [1998]), which the Supreme Court relied upon here, and which is factually indistinguishable from the instant case. In Evangelista, the plaintiff examinee alleged, similar to what Bazakos alleges, that the defendant IME physician, in examining his injured shoulder, “so wrenched and twisted [that shoulder] that he was caused further damage” (Evangelista v Zolan, 247 AD2d at 509). Two years and eight months later, the examinee commenced an action against the IME physician, seeking to recover damages caused by the alleged aggravation of the underlying injury (id.). The IME physician then moved to dismiss the complaint as time-barred, and this Court, concluding that the examinee’s claim “sounded in medical malpractice,” determined that the motion was properly granted (Evangelista v Zolan, 247 AD2d at 509). As this Court found:
“During a physical examination in which a doctor is to provide an independent medical assessment of the [examinee’s] condition and make recommendations for future treatment, the doctor impliedly contracts to [utilize] the same professional skills in examining [the examinee] at the insurance carrier’s request as he [or she] would have in examining [the examinee] for treatment purposes. At the least, a physician has a duty not to injure a patient during his [or her] physical examination, and the breach of such a professional duty gives rise to a cause of action for medical malpractice” (Evangelista v Zolan, 247 AJD2d at 509 [citations and internal quotation marks omitted]).
Although this Court did not explicitly find that the examinee and the IME physician were in a physician-patient relationship, this Court did cite Twitchell, as well as cases such as Lee, Murphy and Hickey (see Evangelista v Zolan, 247 AD2d at 509), which, as indicated above, set forth the principle that a cause of action to recover damages for medical malpractice does not lie in the absence of a physician-patient relationship (see Lee v City of New York, 162 AD2d at 37; Murphy v Blum, 160 AD2d at 915; Hickey v Travelers Ins. Co., 158 AD2d at 116). This Court, being cognizant of that principle, necessarily determined, upon holding that the examinee’s cause of action against the IME physician was one to recover damages for medical malpractice, that the examinee and the IME physician were in a physician-patient relationship. That relationship, though, was clearly *28 limited to the extent that the IME physician only had a “duty not to injure” the examinee during the IME (Evangelista v Zolan, 247 AD2d at 509).[4]
The majority states that “the threshold determination of whether a physician-patient relationship exists is based upon the expectations of the parties during the course of the encounter.” The expectations of an examinee and an IME physician fully justify the imposition of a limited physician-patient relationship that merely places a duty on the IME physician to perform the examination in a manner that does not affirmatively injure the examinee. On one hand, as indicated above, the examinee does not expect the IME physician to treat his or her underlying condition. In addition, as also indicated above, the examinee, who knows that the IME physician is evaluating his or her condition for some third party’s benefit, does not expect to benefit in some other manner from the IME physician’s evaluation. This explains why courts have refused to saddle IME physicians with duties to properly advise or treat the examinee (see e.g. Murphy v Blum, 160 AD2d at 914-915). However, as courts have recognized, the IME physician, whose diagnostic conduct falls within the statutory definition of “practice of the profession of medicine,”[5] impliedly promises that in performing the examination, he or she will exercise his
*29 or her medical skills just as carefully as if the examinee was his or her own patient (see Evangelista v Zolan, 247 AD2d at 509; Twitchell v MacKay, 78 AD2d at 128-129). Thus, as courts have also recognized, the examinee, who can never be compelled to submit to an IME that poses a significant risk of harm (see Marino v Pena, 211 AD2d 668, 668-669 [1995]; Lefkowitz v Nassau County Med. Ctr., 94 AD2d 18, 21-22 [1983]), can expect that, when the examination is conducted, the IME physician will exercise his or her medical skills just as carefully as they would be exercised had he or she been subjecting his or her own patient to that very same examination (see Evangelista v Zolan, 247 AD2d at 509; Twitchell v MacKay, 78 AD2d at 128-129). Implying a limited physician-patient relationship that places a duty on the IME physician to perform the examination in accordance with good and accepted medical practice, and hence, not affirmatively injure the examinee, is therefore perfectly consistent with the parties’ expectations.
Aside from the persuasive reasoning of the cases discussed above, principles of stare decisis also preclude me from concurring in the majority’s determination to characterize causes of action against IME physicians who affirmatively injure examinees as causes of action to recover damages for negligence. The majority has decided to depart from this Court’s holding 10 years ago in Evangelista, which, as discussed above, is on point. Yet, the doctrine of stare decisis, which provides guidance and consistency in future cases by recognizing that settled legal questions should not be reexamined every time they are presented (see People v Bing, 76 NY2d 331, 337-338 [1990]), requires this Court to adhere to prior holdings in controlling cases except under “compelling circumstances” (Eastern Consol. Props, v Adelaide Realty Corp., 95 NY2d 785, 787 [2000]; Cenven, Inc. v Bethlehem Steel Corp., 41 NY2d 842, 843 [1977]). However, I am not convinced that “compelling circumstances” warrant a departure from this Court’s holding in Evangelista.
Principles of stare decisis do not preclude a court from revisiting a holding that is “out of step with the times and the reasonable expectations of members of society” (People v Hobson, 39 NY2d 479, 489 [1976]). Alluding to that principle, the majority announces that “the time has come to acknowledge the essential nature of the relationship” between an examinee and an IME physician. Yet, those “relationships” have existed since 1962, *30 the year that CPLR 3121 (a), which authorizes IMEs, was enacted (see L 1962, ch 308). Thus, when this Court decided Evangelista, it certainly understood the nature of those relationships, and, despite that, essentially determined that an examinee and an IME physician are in a limited physician-patient relationship.
Principles of stare decisis also do not preclude a court from revisiting an incorrect holding (see People v Hobson, 39 NY2d at 488-489). To the extent that the majority is concluding that Evangelista was incorrectly decided, I do not agree, for reasons previously discussed.[6]
Finally, to accept the majority’s characterization of a cause of action against an IME physician who affirmatively injures an examinee as one sounding in negligence will lead to a curious result, to wit, that physicians committing the same negligent act and causing the same injury will be treated differently. Indeed, - if an IME physician and a treating physician each conduct the same examination, depart from good and accepted medical practice in the same regard, and affirmatively injure the examinee in the same manner, the treating physician will *31 enjoy the benefit of a shortened statute of limitations, while the IME physician will not.
For all of the foregoing reasons, Bazakos’s cause of action against Lewis should be characterized as one to recover damages for medical malpractice, and consequently, the instant action was not timely commenced (see CPLR 214-a). Accordingly, I would affirm the order of the Supreme Court granting Lewis’s motion to dismiss the complaint insofar as asserted against him as time-barred (see CPLR 3211 [a] [5]).
Prudenti, RJ., and Skelos, J., concur with Garni, J.; Covello and Santucci, JJ., dissent in a separate opinion by Covello, J.
Ordered that the order is reversed, on the law, with costs, and the motion of the defendant Philip Lewis pursuant to CPLR 3211 (a) (5) to dismiss the complaint insofar as asserted against him is denied.

. The applicable Uniform Rules for Trial Courts (22 NYCRR 202.17) describe the physician as the “examining medical provider.” Personal injury lawyers representing both plaintiffs and defendants, as well as physicians, have adopted the phrase “independent medical examination” or “IME” as a term of art to identify and describe such examination.

. In this setting, the physician’s client is the defendant, defense counsel, or the defendant’s insurance carrier, which selects, retains, and compensates the physician. Frequently, in order to prepare a defense in the pending litigation, the defendant’s attorney or his insurance carrier also direct and define the nature, scope, and focus of the evaluation. There are circumstances when medical examination physicians transcend the statutory medical examination relationship and expressly or implicitly create a physician-patient relationship by providing diagnostic treatment and advice upon which the examinee relies (see Hickey v Travelers Ins. Co., 158 AD2d 112 [1990]). In such a case, the physician’s diagnostic and treatment advice to the patient, not the defendant, defense counsel, or the defendant’s insurance company, transforms the relationship, and thus the duty, into one sounding in medical malpractice (see Lawliss v Quellman, 38 AD3d 1123 [2007]; Hickey v Travelers Ins. Co., 158 AD2d 112 [1990]). However, that did not occur here.

. It is noteworthy that the American Board of Independent Medical Examiners promulgates “Guidelines of Conduct” for its members. Guideline 3 (d) requires the examining physician to “advise the examinee that no treating physician-patient relationship will be established” (American Board of Independent Medical Examiners, Guidelines of Conduct, available at http://www.abime.org/node/21 [accessed Feb. 19, 2008]).

. Lewis incorrectly characterizes the legislation as “seeking to limit causes of action against physicians.” That may be an ancillary result. Nevertheless, the clear legislative intent was to facilitate the provision of diagnostic and treatment health care services to patients, not to provide a litigation benefit to physicians engaged outside of the health care delivery system and actually in the business of providing litigation support services to insurance carriers. It is no secret that many examining physicians limit their engagements to performing statutory medical examinations and do not maintain any significant level of engagement in the treatment and diagnosis of patients in the health care delivery system.

. The Court of Appeals also recognized that the legislative intent included the concern that “ ‘[t]he health and welfare of the people of this State are gravely threatened by the inability of health care providers to get malpractice insurance at reasonable rates’ ” (Bleiler v Bodnar, 65 NY2d at 68, quoting Mem of State Exec Dept, 1975 McKinney’s Session Laws of NY, at 1601-1602).

. Neither CPLR 3121 (a) nor section 202.17 of the Uniform Rules for Trial Courts (22 NYCRR), which authorize medical examinations of parties who have placed their physical or mental condition in issue, characterize such examinations as “independent medical examinations.” Nevertheless, whereas certain courts, lawyers, and physicians refer to such examinations as independent medical examinations, I shall describe such examinations as IMEs, in an effort to avoid any confusion.

. There clearly is no such rule, though. In this regard, the majority recognizes, as other courts have, that if an IME physician proceeded to treat or advise the examinee, and the examinee detrimentally relied on that treatment or advice, a physician-patient relationship, which can either be expressly created or implied (see Lee v City of New York, 162 AD2d at 36), would be implied (see Lawliss v Quellman, 38 AD3d 1123, 1124 [2007]; Forrester v Zwanger-Pesiri Radiology Group, 274 AD2d 374, 374-375 [2000]; Heller v Peekskill Community Hosp., 198 AD2d at 266; Hickey v Travelers Ins. Co., 158 AD2d at 116). Accordingly, if, in such a situation, the IME physician negligently treated or advised the examinee, and the examinee suffered injury as a result, the examinee’s cause of action against the IME physician to recover damages for that injury would he characterized as one to recover damages for medical malpractice (see Lee v City of New York, 162 AD2d at 36; Hickey v Travelers Ins. Co., 158 AD2d at 115).

. Courts in other jurisdictions that have considered the issue presented here have determined that such a limited relationship and duty exists. For example, in Harris v Kreutzer (271 Va 188, 199-201, 624 SE2d 24, 30-32 [2006]), the Supreme Court of Virginia concluded that during an IME, there is a “limited physician/patient relationship” that only vests the IME physician with a duty “to examine the [examinee] without harming [him or] her in the conduct of the examination.” Similarly, in Dyer v Trachtman (470 Mich 45, 53, 679 NW2d 311, 316 [2004]), the Supreme Court of Michigan concluded that during an IME, there is a “limited physician-patient relationship” that places a duty on the IME physician to “conduct the examination in such a way as not to cause harm.” Finally, it is worth noting that the American Medical Association (hereinafter AMA) Code of Medical Ethics provides that “[d]espite” an IME physician’s “ties to a third party,” a “limited patient-physician relationship should be considered to exist” between an IME physician and the ex-aminee (AMA Code of Med Ethics, Ops on Patient-Physician Relationship E-10.03).

. In Savarese v Allstate Ins. Co. (287 AD2d 492, 493 [2001]), the plaintiff examinee, who was the subject of various IMEs, essentially took issue with the IME physicians’ diagnoses and recommendations to her insurance company, which stopped paying her certain benefits. She commenced an action against the IME physicians, seeking to recover damages for medical malpractice (see Savarese v Allstate Ins. Co., 287 AD2d at 492-493). However, this Court determined that the IME physicians were entitled to summary judgment dismissing the complaint (id.). In support of its determination, this Court, which noted that “[n]o action to recover damages for medical malpractice arises absent a physician-patient relationship,” stated that such a “relationship does not exist where [an] examination is conducted solely for the purpose of rendering an evaluation for an insurer” (id. at 493). While the majority relies on this statement in support of its decision today, Savarese involved a situation where an examinee took issue with diagnoses and recommendations that IME physicians made and reported to the third party that retained them (see Savarese v Allstate Ins. Co., 287 AD2d at 493). Thus, it is clear that Savarese is factually distinguishable from both Evangelista and the instant case, which involve situations where examinees were affirmatively injured as a result of physical manipulation by IME physicians. Moreover, in Savarese, this Court did not, as it does today, overrule its prior holding in Evangelista. For these reasons, Evangelista has always been viable, at least up until the instant case.

. “The practice of the profession of medicine” is statutorily defined as “diagnosing, treating, operating or prescribing for any human disease, pain, *29 injury, deformity or physical condition” (Education Law § 6521 [emphasis added]).

. While the majority’s decision is predicated, in part, upon the conclusion that the legislative history underlying CPLR 214-a shows that the Legislature intended that only treating physicians receive the benefit of a shortened statute of limitations, the legislative history of CPLR 214-a does not necessarily support that conclusion. CPLR 214-a, which was enacted in 1975 (see L 1975, ch 109, § 6), shortened the statute of limitations on “[a]n action for medical . . . malpractice” from three to 2V2 years (CPLR 214-a). At the time, there had been a “crisis in the medical profession” because insurance companies were withdrawing, or threatening to withdraw, from this state’s medical malpractice insurance market (Bleiler v Bodnar, 65 NY2d 65, 68 [1985]). Thus, as the majority points out, the Executive Department, which supported the enactment of CPLR 214-a, explained that the statute, and certain others, were being enacted in an effort to prevent a cessation of the delivery of “health care services” (Governor’s Program Bill Mem, at 1, 9, Bill Jacket, L 1975, ch 109). Treating physicians obviously provide, and IME physicians obviously do not provide, such services. However, it should be noted that the Executive Department, which did not suggest that it was of the opinion that only certain types of physicians should get the benefit of a shortened statute of limitations, explained that “even aside from” this goal, a shortened statute of limitations was being supported because of “ ‘special interests involved and other considerations connected with the skilled nature of the work’ of the medical professional” (Governor’s Program Bill Mem, at 3, Bill Jacket, L 1975, ch 109), which includes both treating and IME physicians. Finally, it should be pointed out that the Legislature, which was certainly aware of the relationships between examinees and IME physicians, chose not to define the term “medical malpractice” in a manner that excluded claims against IME physicians. Indeed, the term was not defined at all (see Bleiler v Bodnar, 65 NY2d at 68).